Filed 8/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ALLEN MIDELL,<br><br>        Defendant and Appellant. | A168758<br><br>(San Mateo County Super. Ct.<br> No. 20NF012926A) |

Robert Midell, who is Black, seeks reversal of his multiple felony convictions including attempted premediated murder, torture, and assault because his attorney compared him to an animal, he contends, in violation of the California Racial Justice Act of 2020 (RJA) (Pen. Code,[1] § 745, et seq.). Because the comparisons made here were part of a tactically developed defense theme designed to negate the intent elements of the most serious offenses charged, Midell is procedurally barred from now using them as a basis for reversal on appeal. Midell's additional arguments challenging the court's evidentiary rulings and sentencing are also unpersuasive; thus, we affirm the judgment.

---

[1] Further undesignated statutory references are to the Penal Code.

# BACKGROUND

## I. Hotel V

Midell frequently rented a room at the Hotel V in South San Francisco, often for weeks at a time. On November 2, 2020,[2] Midell was taken away from the hotel in an ambulance. Midell stayed at the hotel again on November 7, but the next day was removed for trespassing when he would not leave after the checkout time.

Midell returned the afternoon of November 9, seeking to stay the night, but the hotel manager, Deepak Silam, refused, and Midell left. Midell came back around 8:00 p.m. and tried to check in with the night manager, Arvind Gupta. Gupta said he needed to speak with Silam, who he started to call, but Midell walked away. Less than a minute later, Midell broke through the locked office door and "very aggressively" charged at Gupta with a boxcutter.

Within "two [or] three seconds," Midell stabbed Gupta in the neck below his left ear, near the carotid artery. The boxcutter struck Gupta and knocked off his glasses, but the blade failed.[3] Fearing for his safety, Gupta attempted to restrain Midell's hands, which caused Midell to drop the boxcutter. Midell pinned Gupta to the ground and began stabbing him with a plastic pen he had grabbed from the desk. When the pen broke, Midell started "chewing on" Gupta's arms, face, and chest, "trying to rip the flesh

---

[2] Subsequent dates are in 2020 unless otherwise specified.

[3] Gupta felt "the metal" on his neck but did not know whether it was the blade or just the handle. After the incident, the responding officers located the boxcutter on top of a nearby desk. The thumb slide of the boxcutter was in the forward position, indicating the blade had been extended, but the blade itself was broken. Officers located the top half of a razor blade on the ground behind the desk; it was "a perfect fit" with the bottom half that remained in the boxcutter.

out." Midell then headbutted Gupta "40 to 50 times" over nearly two minutes.

South San Francisco Police Officer Steven Miller was dispatched to Hotel V around 8:16 p.m. Upon arrival, he heard "a thumping noise" from inside. Miller entered the back office and overheard "a muffled statement" that "sounded like, help me, or, over here." Inside the front office, Miller saw "two males on the ground in what appeared to be a physical altercation" and called for backup.

Miller instructed Midell to "get off of him" and unsuccessfully tried to pull Midell off Gupta. To "distract him," Miller punched Midell two times in the side of the face with no effect. Miller then tased Midell three times, but Midell still did not release Gupta. Another officer arrived and began striking Midell's hands with a baton, but Midell continued biting Gupta. After approximately five minutes, Miller rendered Midell unconscious with an elbow strike to his head, allowing officers to pull Gupta out from under Midell. Midell was taken to the hospital where he stayed until November 11, when he was discharged and booked into San Mateo County's Maguire Correctional Facility.

Gupta was separately taken to the hospital and treated for numerous injuries. He suffered facial swelling and bruising and had bitemarks and scratches on his hands, arms, face, and chest, some of which left scars. He had trouble walking and experienced dizziness for weeks after the incident.

## II.  Maguire Correctional Facility (Maguire)

### A.  December 22, 2020

On December 22, Officers Tatiana Trujillo and Austin Silva were on duty at Maguire. Shortly after 11:00 a.m., Midell exited his cell for recreation time wearing a blanket over his head. Midell started yelling and

3

singing loudly, disrupting other inmates. Silva told Midell to remove the blanket and behave, and Midell complied.

However, after briefly returning to his cell, Midell exited again singing and yelling loudly. Trujillo told Midell "to turn around and cuff up," meaning place his hands behind his back to be handcuffed. Midell ignored the command and walked away, yelling, "Didn't I tell you not to play? Didn't I tell you not to play with me?" As Trujillo approached Midell to handcuff him, Midell took a "bladed stance" and punched Trujillo on the left side of her face with a closed fist. The punch had such force that Trujillo heard ringing and felt dazed. Trujillo knocked Midell to the ground using a "leg sweep." Silva then jumped on Midell but needed the assistance of additional officers to handcuff him. Trujillo and another assisting officer sustained injuries from the incident.

When subsequently interviewed by Silva, Midell stated he saw a "demon" and "snakes" in Trujillo's face before the attack.

## B. January 11, 2021

Two weeks later, on the morning of January 11, 2021, Maguire Officers Oscar Garcia Ceja and Kyle Ballard conducted a "routine count inspection" that included Midell's cell. Garcia Ceja opened Midell's cell door and asked him to exit so they could deliver his breakfast and search his cell. As Midell stepped out, he "lunged" at Garcia Ceja and punched him in the face, knocking off Garcia Ceja's glasses. It took more than four officers to restrain Midell, who made audible "kind of growls or exertions" as he resisted. Garcia Ceja and Ballard were injured in the process.

## III. Trial and Sentencing

Midell faced a nine-count consolidated felony information at trial. Five charges related to the incident at Hotel V: deliberate and premediated

4

attempted murder (§§ 187, 189, subd. (a), 664; count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), first degree burglary (§ 460, subd. (a); count 3), torture (§ 206; count 4), and resisting an executive officer (§ 69; count 5). As to counts 1 through 3, the information alleged Midell caused great bodily injury (§ 12022.7, subd. (a)).[4] Counts 6 and 7—battery on a custodial officer (§ 243.1) and resisting an executive officer (§ 69)—were based on the December 22 incident involving Trujillo. Counts 8 and 9— battery on a custodial officer and resisting an executive officer—were based on the January 11, 2021 incident involving Garcia Ceja.[5]

## A. Trial

Gupta, Silam, and the involved officers testified at trial; the jury was shown video footage from officer body cameras for all three incidents, as well as from the Hotel V surveillance cameras.

In closing argument, defense counsel did not minimize Midell's conduct; he instead challenged Midell's mental state. Focusing on the specific intent crimes of attempted murder and torture, counsel explained, "What we have here—and, you know, it gives me no pleasure to say—a very troubled person,

---

[4] The information specifically alleged Midell inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the assault (count 2) and further alleged a person was present during the burglary (§§ 1192.7, subd. (c); 667.5, subd. (c); count 3). The People respectively struck and dismissed these allegations at the close of their case in chief. At sentencing, in the interest of justice per section 1385, the court dismissed the allegations that Midell used a deadly weapon (§ 12022, subd. (b)(1)) in the commission of the attempted murder and torture charges.

[5] As to all counts, the information alleged a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)) and six circumstances in aggravation (§ 1170, subd. (b)(2)), which the People subsequently amended to apply to counts 1 through 4 only. After the close of evidence, the court granted Midell's motion to dismiss counts 7 and 9 (§ 69) for insufficient evidence.

fight-or-flight reflexes broken. . . . Someone who attacks people. But we have an impulsive man who when he gets angry, he becomes like a raving animal. Like a raving animal. He doesn't think. He doesn't plan. He doesn't have intent. He snaps. And that's what he did on November 9th. And as it relates to the assault charges, the snapping is not a defense. Okay? The snapping is not a defense. You can't just punch someone because you get angry. [¶] But as we look at specific intent crimes, you must look to someone's mindset. . . . [¶] . . . [¶] We don't have intent here. We have a person who snaps."

Defense counsel continued to focus on mental state while discussing the general intent offenses. Referring to the Trujillo incident at Maguire, counsel stated, "Because once Mr. Midell gets mad, that's it. He doesn't have intent. He doesn't plan. He doesn't premeditate or deliberate. He acts impulsively." Counsel then played part of the Hotel V video footage, explaining, "This is a man that once he gets mad, and he gets mad like that, he needed to get beat until he [got] knocked out to stop him. That shows the type of anger that's beyond thought."

Counsel returned to the Trujillo incident and played body camera footage, directing the jurors: "listen to the groans of the defendant. The grunting. [¶] He keeps going. Listen to that. [¶] Is that a rational man? No. Is that a man that operates with a plan? No. Those are the groans of someone who's acting like an animal. And it does me no service to say it, but that's the truth. And the law takes things into consideration when it specifies between general intent and specific intent."

The jury ultimately found Midell guilty of the seven charges before them and found true the special allegations. In a bifurcated bench trial on the factors in aggravation, the court found true the allegations that Midell

served a prior prison term and had numerous prior convictions (§ 1170, subd. (b)(2)) but found not true the prior strike allegation (§ 1170.12, subd. (b)).

## B. Sentencing

At sentencing, the court granted Midell's motion to strike the section 1170, subdivision (b)(2) circumstances in aggravation found by the jury because no related instructions had been given.

After listening to the arguments of counsel, the court stated: "Mr. Midell, watching your vicious attack on the victim in this case on that surveillance video has to be one of the more haunting things that anyone is ever going to see. It was prolonged. It was animalistic. As noted, it was unprovoked. The victim was unarmed. The victim miraculously defended himself for a long enough period of time for law enforcement to arrive and come to his aid. Even then, you would not release your grip on the victim. You continued to bite the man as officers were trying to pull you off. [¶] The degree to which you tortured the victim in this case was proven beyond a reasonable doubt as is attested to by the jury's verdict, but it also implicates the extreme danger that you pose to society."

The court determined that section 654 did not require it to stay the sentence on either the attempted murder or torture convictions because there was "a separate intent and objective in torturing the victim in this case that went above and beyond the other crimes for which [Midell] is convicted."

The court sentenced Midell to an indeterminate term of seven years to life on the attempted murder conviction (§§ 187, 189, subd. (a), 664; count 1), plus a consecutive three years for the great bodily injury enhancement and imposed a consecutive indeterminate term of seven years to life on the torture conviction (§ 206; count 4). The court then sentenced Midell to the

midterm of two years for felony resisting (§ 69; count 5) and to eight-month terms (one-third the midterm) for each battery conviction resulting from the Maguire incidents (§ 243.1; counts 6 & 8), all of which would run consecutive to the indeterminate terms. The court imposed but stayed per section 654 the nine-year term for the enhanced, aggravated burglary (§§ 460, subd. (a), 1170, subd. (b)(2), 12022.7, subd. (a); count 3) and the consecutive one-year term for the assault with a deadly weapon associated with the incident at Hotel V (§ 245, subd. (a)(1); count 2).

Midell filed a timely notice of appeal.[6]

## DISCUSSION

Midell asserts RJA violations based on defense counsel's animal comparisons and the trial court's characterization at sentencing of Midell's behavior as "animalistic." Midell contends the trial court similarly erred in failing to inquire sua sponte into the purported conflict of interest created by his "trial counsel's use of racially discriminatory language" in closing argument. Midell also argues the court improperly excluded drug intoxication and mental health evidence and the prosecutor committed misconduct by taking advantage of the latter exclusion. Midell further claims

---

[6] Before filing an opening brief, Midell moved to stay this appeal and for limited remand to allow him to file a motion for relief under the RJA in the trial court. We denied the motion without prejudice to raising any RJA claims in this direct appeal. After Midell's appeal was fully briefed, he sought leave to file a supplemental opening brief based on *Sanchez v. Superior Court* (2024) 106 Cal.App.5th 617 (*Sanchez*), which held that the trial court's removal of the deputy public defender, over defendant's objection, based on a potential RJA violation was not an abuse of discretion. We granted leave and also permitted a supplemental respondent's brief, after which Midell filed a supplemental reply brief. The Office of the State Public Defender applied for leave to file an amicus curiae brief in support of Midell, which we granted. The Attorney General timely filed a response.

the cumulative effect of these errors deprived him of a fair trial and requires reversal. Regarding sentencing, Midell argues the court erred by imposing consecutive sentences on the attempted murder and torture convictions and by not staying either per section 654.

In response, the Attorney General generally argues Midell's convictions and sentences should be affirmed. With respect to the RJA, the Attorney General asserts that Midell's "claims are either forfeited or procedurally barred as invited error" and "must therefore be analyzed as [claims of] ineffective assistance of counsel." As amicus curiae, the State Public Defender urges us to address Midell's RJA contentions on the merits and refutes the assertion of invited error and forfeiture as "contrary to both the language and intent of the RJA."

Consistent with the RJA's goal to protect "the integrity of the judicial system," we hold that Midell is procedurally barred from using his counsel's tactical decision as a basis for reversal. (Stats. 2020, ch. 317, § 2, subd. (i).) Similarly, we are not persuaded by Midell's claim that the trial court had a sua sponte duty to "inquire" into any potential racial bias uderlying his counsel's closing argument. Midell does not demonstrate any evidentiary error or related misconduct; thus, we reject his claim of cumulative error. Because we see no error in his sentencing either, we will affirm Midell's convictions.

## I. The California Racial Justice Act of 2020

The RJA commands: "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).)

A defendant may establish a violation of the RJA by a preponderance of the evidence in four ways, including as relevant here, if, "During the

9

defendant's trial, in court and during the proceedings, the judge, an attorney in the case, . . . or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin," unless "the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) Racially discriminatory language is "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to . . . language that compares the defendant to an animal." (§ 745, subd. (h)(4).)

The stated purpose of the RJA is "to eliminate racial bias from California's criminal justice system." (Stats. 2020, ch. 317, § 2, subd. (i).) As the Legislature explained, "Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system." (Stats. 2020, ch. 317, § 2, subd. (e).) The RJA's goal "is not to punish . . . bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system." (Stats. 2020, ch. 317, § 2, subd. (i).)

## A. Closing Argument and Sentencing

According to Midell, his trial counsel's and the court's statements "comparing" him to an animal violated the RJA, "requiring automatic reversal." In fact, Midell argues the animal comparisons sparked a sua sponte duty on the court to investigate his attorney's potential racial bias that purportedly presented a conflict of interest. However, because counsel's deliberate and repeated use of language likening Midell to an animal both during trial and in closing argument forms the cornerstone of the defense case—challenging the prosecution's ability to prove the requisite mental state—we must conclude that Midell's RJA claim arising out of that strategic

10

conduct is barred by the doctrine of invited error and Midell's RJA claim based on the court's comment is forfeited for failing to object.[7]  We also reject Midell's attempt to create a sua sponte duty that would require the court to inquire into the litigation strategy of defense counsel.

### 1. *Closing Argument and Invited Error*

An RJA claim, "like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court."  (*People v. Lashon* (2024) 98 Cal.App.5th 804, 812 (*Lashon*) [finding RJA claim based on judicial conduct forfeited when raised for the first time on direct appeal]; *People v. Singh* (2024) 103 Cal.App.5th 76, 114–116 [agreeing with *Lashon*'s reasoning and declining to consider merits of whether detective used racially discriminatory language in testifying]; *People v. Corbi* (2024) 106 Cal.App.5th 25, 41–44 [agreeing with *Lashon* in finding general objection to "improper and inflammatory" comments did not preserve RJA claim].)

The doctrine of invited error "is an 'application of the estoppel principle' " and applies when a party invites the court or the jury to commit error.  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403, see also *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 960, fn. 8 [discussing counsel's obligation to "not mislead a jury"].)  Under this doctrine, " 'when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be

---

[7] Although distinct doctrines, both forfeiture and invited error act as procedural bars to reaching the merits.  (*People v. Hampton* (2022) 74 Cal.App.5th 1092, 1102 [first addressing "procedural bars" of invited error and forfeiture, which "if applicable, would obviate the need to address the merits"]; see also *San Mateo Union High School Dist. v. County of San Mateo* (2013) 213 Cal.App.4th 418, 436 [discussing the different doctrines].)

reversed because of that error.' " (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000, quoting *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.)

Midell acknowledges "that counsel's strategy was to argue [Midell] lacked the *mens rea* for torture and attempted murder," the two most serious charges, and that "the animal references were made" in furtherance of that argument. But he asserts the doctrine of invited error should not apply because the record does not make clear that defense counsel made "a conscious choice" in "using racially coded language" and does not reflect counsel's intent to "deliberately violat[e]" the RJA.

However, "[i]n cases involving an action affirmatively taken by defense counsel," as opposed to an omission or failure to act, "we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [finding appellate claim barred as invited error where defense counsel "affirmatively joined" in a cause challenge to a prospective juror].) Further, absent contrary evidence, "Counsel is presumed competent and informed as to applicable constitutional and statutory law." (See *People v. Barrett* (2012) 54 Cal.4th 1081, 1105.) Midell fails to direct us to anything in the record indicating counsel was ignorant of the RJA.

In any event, whether or not defense counsel intended to violate the RJA with his commentary is not the focus of our inquiry: "[T]he record must show only that counsel made a conscious, deliberate tactical choice," "it need not additionally show counsel correctly understood all the legal implications of the tactical choice." (*People v. Cooper* (1991) 53 Cal.3d 771, 831; see also *People v. Duncan* (1991) 53 Cal.3d 955, 970 [rejecting argument "that the invited error doctrine is inapplicable because counsel's decision . . . was based

on a misunderstanding of the law"]; *People v. Wader* (1993) 5 Cal.4th 610, 658 [invited error doctrine applies notwithstanding the fact that defense counsel's "tactical choice . . . may be an incompetent one"].)

Moreover, as illustrated by the exchange below, defense counsel's comments were an affirmative and tactical decision that reflect the central theme of Midell's defense: "He doesn't have intent." They are not the result of some "mistake" or misunderstanding of the RJA or its implications.

Defense counsel made his first animal analogy while cross-examining Officer Ballard about the assault on Garcia Ceja. He asked Ballard about the four people needed to restrain Midell and characterized Midell's utterances "throughout the entire video" as "growls":

"Q. In the video, you hear kind of growls or exertions . . . . Some kind of audible noise. Did you hear that—

"A. Yes.

"Q.—in the video? Who was making those sounds?

"A. I believe it was Mr. Midell.

"Q. And he was kind of exerting himself physically, and sometimes when you do that, you make that noise audibly; is that correct?

"A. Yes.

"Q. Kind of when you exert yourself or use a lot of force with your body, people sometimes make that noise; is that fair?

"A. I think that's fair to say, yes.

"Q. That's the noise that we are hearing throughout the entire video, correct?

"A. I believe so."

The purpose of characterizing Midell's utterances as "growls" became obvious in closing argument when defense counsel explicitly stated, "What we

13

have here—and, you know, it gives me no pleasure to say—a very troubled person, fight-or-flight reflexes broken. . . . But we have an impulsive man who when he gets angry, he becomes like a raving animal. Like a raving animal." Counsel went on to explain the relevance of this comparison: "And as it relates to the assault charges, the snapping is not a defense. Okay? The snapping is not a defense. You can't just punch someone because you get angry. [¶] But as we look at specific intent crimes, you must look to someone's mindset. . . . [¶] . . . [¶] We don't have intent here. We have a person who snaps."

Defense counsel replayed videos of the incidents, pausing to narrate key points, distinguishing between the types of intent associated with each offense and repeatedly referring to Midell as animal: "I want you to listen to the groans of the defendant. The grunting. . . . [¶] . . . [¶] Is that a rational man? No. Is that a man that operates with a plan? No. Those are the groans of someone who's acting like an animal. And it does me no service to say it, but that's the truth. And the law takes things into consideration when it specifies between general intent and specific intent."

Thus, because Midell's counsel's comments were deliberate and tactical decisions, the invited error doctrine precludes Midell from using them as a basis for reversal on appeal. (*Norgart v. Upjohn, supra*, 21 Cal.4th at p. 403 [invited error doctrine "prevent[s] a party from misleading the trial court and then profiting therefrom in the appellate court"].) Further, because no recognized exception to the invited error doctrine applies—including Midell's novel argument for an exception in cases of mistake—we follow our colleagues in *Lashon* and decline the request to exercise our discretion to reach the merits of Midell's RJA claim. (*Lashon, supra*, 98 Cal.App.5th at p. 815 ["a defendant may be found to have forfeited a section 745 claim of

14

racial bias made for the first time on direct appeal in the absence of a showing that an exception to the forfeiture doctrine applies"].)[8]

## 2. *Sentencing and Forfeiture*

Midell next argues the court violated the RJA at sentencing by describing his conduct as "animalistic." The Attorney General asserts Midell forfeited the claim by failing to object below, or alternatively, Midell's challenge is barred as "part of the same invited error that bars" Midell's RJA claim based on his counsel's statements. Midell accepts that his counsel did not object to the court's statement that the "vicious attack" on the Gupta, as seen on the surveillance video, "was animalistic." Nor did he object or speak out when the court invited "[a]ny comments" after announcing the prospective sentence. Despite these customary grounds for forfeiture, Midell and the State Public Defender urge us to reach the merits of the asserted RJA claim because "procedural barriers undermine[ ] the Legislature's desire to eradicate racial bias." We agree with the Attorney General that Midell has forfeited this RJA challenge.

Ordinarily, the failure to object to judicial misconduct below forfeits the claim on appeal. (*People v. Woodruff* (2018) 5 Cal.5th 697, 769; *People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1219–1222 (*Wagstaff*) [defendant forfeited RJA claim by failing to object to trial court's use of the phrase " 'strong young buck' "].) Indeed, "when a claim under the RJA concerns a

---

[8] Although our conclusion means a merits analysis is not essential to this appeal, we do note that the plain language of the RJA demonstrates its focus on misconduct by "[t]he state." (§ 745, subd. (a).) The " 'State' includes the Attorney General, a district attorney, or a city prosecutor," who "shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subds. (a), (h)(5).) As such, defense counsel's animal references, which were made as part of a thought-out defense, arguably do not implicate the RJA.

trial court's conduct, requiring the claim to be raised below furthers one of the central motivations for the RJA's enactment" of eliminating implicit bias. (*Wagstaff*, at p. 1220.) "It makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue a section 745 claim for the first time on direct appeal." (*Lashon*, *supra*, 98 Cal.App.5th at p. 813.) Considering the objectives of the RJA, "It is particularly important that counsel object at the earliest opportunity when the issue concerns alleged bias or prejudice by the trial court" because the objection " 'serves an important purpose in raising the court's consciousness of the biases the [RJA] is intended to eliminate.' " (*Wagstaff*, at p. 1220.)

Thus, we decline the request to consider Midell's unpreserved claim; "if the Legislature had intended for RJA claims to be decided on their merits whenever raised, it would not have required RJA motions to be 'made as soon as practicable . . . .' " (*People v. Corbi*, *supra*, 106 Cal.App.5th at p. 43; see also *Lashon*, *supra*, 98 Cal.App.5th at 815 [rejecting argument that "forfeiture should not apply because the legislative intent as expressed in the statute and subsequent amendments" demonstrates a goal to "provide remedies for racial bias"].)[9]

---

[9] Viewed in isolation, the court's use of the term "animalistic" arguably falls within the scope of the RJA because it is "language that compares the defendant to an animal." (§ 745, subd. (h)(4).) But were we to consider the merits of Midell's claim of an RJA violation in sentencing, which we do not, we must also recognize the "racially discriminatory language," prohibited by the RJA is defined as "language that, to an objective observer, explicitly or implicitly appeals to racial bias . . . ." (§ 745, subd. (h)(4); *Wagstaff*, *supra*, 111 Cal.App.5th at p. 1222.)

### 3. *Duty to Investigate*

Midell further contends the Fourth District's split decision in *Sanchez* should be read to impose a sua sponte duty upon the court to investigate defense counsel's comparisons of his client to an animal as potentially violative of the RJA. But *Sanchez* is distinguishable and, on this record, the trial court had no sua sponte obligation to investigate the conduct of defense counsel.

In *Sanchez*, during seemingly contentious plea negotiations, the deputy public defender stated to the prosecutor: " ' "I really don't care.' . . . [R]ead between the lines. . . . I am a white man. What do I care? It's not my people we are incarcerating." ' " (*Sanchez, supra*, 106 Cal.App.5th at p. 624.) The district attorney complained that defense counsel's comment violated the RJA and required further investigation. (*Sanchez*, at pp. 624–625.) The court conducted the requested investigation, held a hearing, and removed defense counsel from the case despite the defendant's expressed desire that his attorney remain. (*Id.* at p. 625.) The defendant filed a writ petition, challenging his attorney's removal, which the Court of Appeal denied, explaining, "the trial court retains discretion to remove counsel even where a

First, the court's characterization of Midell's conduct as "animalistic" mimics defense counsel's rhetoric. Second, although we do not condone the negative comparisons of any human being to an animal, in this case-specific context, where defense counsel relied on and even narrated the videos of the Hotel V assault to emphasize his argument that Midell did not harbor the specific intent necessary to be found guilty of the charged offenses, it is unlikely an objective observer would consider the court's animalistic reference to be an appeal to racial bias. (See, e.g., *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077–1078 [prosecution's characterization of defendant as a "predator," defined as " ' "an animal that lives by predation," ' " did not violate RJA because "an objective observer would [not] conclude that the prosecutors' comments appealed to racial bias either explicitly or implicitly"].)

defendant offers to enter an otherwise valid waiver of his interests." (*Id.* at pp. 626, 633–634.) The dissent disagreed not with the majority's comment regarding the trial court's discretion, but because it concluded the trial court's ruling was "erroneous and prejudicial" since there was "no evidence of a potential RJA claim against the deputy public defender." (*Id.* at p. 635.)

But neither the majority nor the dissent held or even suggested the trial court had a sua sponte duty to police potential RJA violations; they did not consider the issue because it was the district attorney who had raised the RJA claim. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11 [" ' "cases are not authority for propositions not considered" ' "].) We see no reason to create such a sua sponte investigation obligation in this case, particularly given the express and acknowledged tactical purpose of defense counsel's comments.

Moreover, "In the criminal context, . . . counsel is captain of the ship." (*In re Horton* (1991) 54 Cal.3d 82, 95.) Meaning, it is trial counsel's province to decide " ' "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." ' " (*People v. Frazier* (2024) 16 Cal.5th 814, 858.) Thus, it would have been improper for the court to interfere with defense counsel's right to determine trial tactics, including challenging the mental state required to be proven by the prosecution.

Nor would it have been appropriate for the court to, for example, stop closing argument to conduct an RJA investigation. (See *People v. Williams* (1991) 228 Cal.App.3d 146, 150–151 [" 'Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of

18

trial judges and counsel in our legal system' "].)  Such a sua sponte step would not only have created an appearance of misconduct before the jury likely to have prejudiced Midell, but the related investigation would have run a high risk of violating both the attorney-client privilege and the right to counsel protected by the Sixth Amendment of the United States Constitution. (See, e.g., *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 732 [the attorney client privilege is " 'absolute and disclosure may not be ordered' "]; *DP Pham LLC v. Cheadle* (2016) 246 Cal.App.4th 653, 659 [reversing trial court for reviewing the content of confidential attorney-client communications to evaluate privilege]; see also Evid. Code, § 915, subd. (a) ["the presiding officer may not require disclosure of information claimed to be privileged"].)  As such, given the readily apparent tactical purpose for counsel's comments, the trial court had no sua sponte obligation to inquire into defense counsel's potential RJA violation.

## B.  Effectiveness of Counsel

Having found the RJA claims procedurally barred, we turn to Midell's ineffective assistance of counsel claim.  To demonstrate ineffective assistance of counsel, a defendant " 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165; *Strickland v. Washington* (1984) 466 U.S. 668, 687.)  On direct appeal, "a court may find deficient performance only if: (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Campos* (2024) 98 Cal.App.5th 1281, 1298.)  A reviewing court will generally presume " ' " 'counsel's conduct falls within the wide range of reasonable professional assistance' " ' " and will not second guess tactical

19

choices " 'unless there could be no conceivable reason for counsel's acts or omissions.' " (*Wagstaff, supra*, 111 Cal.App.5th at p. 1223, quoting *People v. Weaver* (2001) 26 Cal.4th 876, 925–926; accord, *People v. Jasso* (2025) 17 Cal.5th 646, 675–676.)

On this record, Midell does not demonstrate that counsel's performance was deficient. (See *People v. Wilson* (2025) 111 Cal.App.5th 1020, 1026, 1032–1034 [rejecting claim of ineffective assistance, over the People's concession, because "counsel could have reasonably concluded" use of the term "gorilla pimp" was not racially discriminatory or coded language under the RJA].) At trial, the most serious charges Midell faced were premediated attempted murder and torture. Both are specific intent crimes and carry life sentences. (*People v. Mumin* (2023) 15 Cal.5th 176, 190 ["*attempted* murder requires a specific intent to kill"]; *People v. Burton* (2006) 143 Cal.App.4th 447, 451–452 [torture requires " 'the specific intent to cause cruel or extreme pain and suffering' "]; §§ 664, subd. (a), 206.1.) The remaining charges—burglary, assault, resisting an executive officer, and resisting arrest—were crimes with determinate sentences no longer than six years.[10] It is in this context that Midell's counsel made a rational tactical decision to attack the specific intent elements of the most serious offenses.

Moreover, the videos of the Hotel V incident confirmed to the jurors that Midell's attack was violent, unprovoked, and prolonged. Over the course of nearly 15 minutes, he can be seen repeatedly stabbing, punching, biting, and headbutting the unarmed Gupta, whom he had surprised and pinned to the ground. Midell's assaultive conduct is clear, and the videos present no

---

[10] Assault carries a maximum term of four years (§ 245, subd. (a)(1)); first degree burglary is punishable by up to six years (§ 461, subd. (a)); and felony violations of sections 69 and 243.1 are punishable by terms up to three years (§ 1170, subd. (h)(1)).

suggestion of any possible self-defense argument. As such, challenging the mental state element was a reasonable—if not the only—defense available to Midell. Thus, we cannot say counsel's decision to use animal references to attempt to convince the jury that Midell did not act with specific intent had no conceivable tactical reason, and that it was only an appeal to implied bias. (See *People v. Quintero*, *supra*, 107 Cal.App.5th at pp. 1070, 1077–1078 [rejecting an ineffective assistance of counsel claim despite counsel's failure to object when prosecutor called defendants " 'monsters' " and " 'predators' " during closing argument because there was neither "deficient performance" nor "resulting prejudice" ]; *People v. Singh*, *supra*, 103 Cal.App.5th at p. 117 ["We can discern multiple reasonable tactical reasons why defense counsel may not have objected" to the prosecution's characterization of the homicide as an " 'honor killing' "]; accord, *People v. Caro* (2019) 7 Cal.5th 463, 520 [declining to find counsel's performance deficient because "there may have been plausible strategic reasons [for counsel's conduct] that are not apparent on direct appeal"].) Accordingly, Midell fails to show his counsel's performance was deficient.

Because Midell has not demonstrated that counsel's performance was deficient, we need not decide whether counsel's performance prejudiced Midell's defense, assuming arguendo such a showing is required. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697 [no need "to address both components of the inquiry if the defendant makes an insufficient showing on one"]; see also *People v. Simmons* (2023) 96 Cal.App.5th 323, 337 [suggesting the RJA "forecloses any traditional case-specific harmless error analysis"].) We therefore turn to Midell's evidentiary claims.

21

## II. Exclusion of Drug Evidence

Before trial, the prosecution moved in limine to exclude reference to Midell's drug use or its potential effects on November 8 and 9. Defense counsel did not intend to call an expert witness but, defense counsel sought to introduce unspecified evidence that Midell was kicked out of Hotel V after being taken away by ambulance on November 2 for overdosing and that Midell may have used drugs on November 8, the night before the attack on Gupta. The court granted the motion to exclude, finding "irrelevant" evidence of drug use on any day other than November 9, the date of the attack.

Days later, defense counsel sought to introduce testimony from Silam, the Hotel V manager, based on a statement Silam purportedly made to police officers that Midell was "possibly high" on November 9. The prosecutor objected as Silam had no training or experience in "drug recognition or evaluating people who are under the influence," nor did defense counsel represent Silam had any specialized experience or expertise. The court agreed, explaining that the proffered opinion lacked foundation: "Many people are qualified in offering their opinion as to whether or not somebody had been drinking alcohol. [¶] . . . [¶] A far fewer proportion of the demographic are qualified to answer any questions as to whether someone is under the influence of a controlled substance." Thus, the court declined to "allow an unqualified civilian witness . . . to offer his opinion as to whether or not [Midell] was under the influence of drugs on November 9th."

In response, Midell's counsel represented that an investigator would try to contact Silam to establish a further foundation. The court reiterated, "to make it perfectly clear," it was "not precluding pursuit of a legitimate defense, but it always has to be rooted in the facts of the case." Midell's

counsel did not renew his request or offer additional support, and Silam did not testify at trial about Midell's potential drug use.

Relying on *People v. Williams* (1988) 44 Cal.3d 883 (*Williams*), Midell now argues the trial court "incorrectly ruled that a stricter admissibly standard applied when a layperson opined on drug intoxication, as opposed to alcohol intoxication." We see no error and disagree with Midell's characterization of the court's ruling and *Williams*. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 [trial court's ruling on admissibility of evidence reviewed for abuse of discretion].)

Evidence of intoxication is admissible to negate the requisite mental state for attempted murder and other specific intent crimes such as the torture charge here (§ 29.4, subd. (b)), but all evidence must be supported by an adequate foundation, i.e., personal knowledge (Evid. Code, §§ 702, 800). *Williams* clarified "lay opinion testimony that a person is under the influence of narcotics is admissible," but only "if sufficient foundation is laid." (*Williams*, *supra*, 44 Cal.3d at p. 914.) A witness's personal knowledge must be specific to the opinion being offered. (*People v. Navarette* (2003) 30 Cal.4th 458, 493–494 [affirming exclusion where "defendant did not establish that the witness was sufficiently knowledgeable about cocaine use to give an opinion as to whether defendant was under the influence of that drug"].)

Here, counsel offered neither specific proffer of Silam's drug-related testimony, nor any foundation for Silam's potential opinion that Midell may have been under the influence of drugs on November 9. Midell never represented, for example, that Silam had experience with controlled substances or had previously observed Midell or others under the influence of any known narcotic. The court did not abuse its discretion in excluding such non-specific testimony that lacked a foundational basis.

## III. Exclusion of Mental Health Evidence

The People also moved in limine to exclude any reference to Midell's asserted "mental health issues" "in the absence of competent evidence establishing [their] existence."[11] Although defense counsel did not intend to "call a doctor to indicate that [Midell] suffered from any mental health issues," he sought to introduce Midell's statements that, prior to the first Maguire assault, Midell saw Trujillo as a demon: "her eyeball moved to the side of her head," and "snakes [were] coming out of her head." Counsel argued these statements were relevant to show Midell was "delusional" and thus lacked knowledge that Trujillo was a correctional officer. The court disagreed and granted the motion to exclude mental health evidence.

Midell subsequently moved to admit the same statements, arguing they were admissible as a hearsay exception to show Midell's state of mind during the assault. (Evid. Code, § 1250.) The court denied the motion, noting that Midell had also expressly stated it was not "acceptable trying to hurt [Trujillo]" or "beat up little deputies," which demonstrated his awareness that Trujillo was a correctional officer.

On appeal, Midell argues the exclusion amounts to constitutional error.[12] We disagree. "Evidence of mental disease, mental defect, or mental disorder . . . is admissible solely on the issue of whether or not the accused

---

[11] In November 2021, defense counsel had declared doubt about Midell's competency to stand trial (§ 1368). After two court appointed experts found Midell competent, the trial court adopted the findings without objection and reinstated proceedings on January 3, 2022. The competency determination is not at issue in this appeal.

[12] In the trial court, Midell argued his statements were relevant to counts 6 (§ 243.1) and 7 (§ 69) involving Trujillo. Because count 7 was ultimately dismissed, Midell's appeal focuses exclusively on count 6. We limit our discussion accordingly.

actually formed a required specific intent . . . when a specific intent crime is charged."  (§ 28, subd. (a).)

A violation of section 243.1 requires that "the person committing the offense knows or reasonably should know that the victim is a custodial officer."  (§ 243.1; see also CALCRIM No. 946.)  The "reasonably should know" standard is an objective one that is not dependent on Midell's subjective mental state.  (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 230 ["The term 'reasonably should have known,' . . . implicates an objective criminal negligence standard"]; *People v. Linwood* (2003) 105 Cal.App.4th 59, 71 [" 'reasonably should have known' " sets the mens rea requirement at "knowledge or constructive knowledge"].)  Thus, as the jury was instructed, section 243.1 is a general intent crime, and evidence of mental delusion is inadmissible under section 28 to negate an objective mental state.  (See *People v. Finney* (1980) 110 Cal.App.3d 705, 712–714 ["A defendant's voluntary intoxication is no defense to the general intent crimes of simple assault or assault with a deadly weapon"]; *People v. Parks* (1971) 4 Cal.3d 955, 959–960 [no error in refusing intoxication instructions for general intent crime of assault with a deadly weapon].)

## IV.  Prosecutorial Misconduct

Midell next argues "the prosecutor unfairly took advantage of the ruling excluding evidence that [Midell] thought Trujillo was a demon" by arguing that Midell used violence against Trujillo because "he was a sexist who did not like women telling him what to do."  Midell's argument is not supported by the record.[13]

---

[13] Midell's trial counsel did not object to the prosecutor's comments, but the Attorney General does not assert forfeiture; thus, we address the merits and do not reach Midell's related ineffective assistance of counsel claim.

Preliminarily, the prosecutor did not say Midell was a "sexist"; rather, she argued Midell "didn't like being told what to do by a woman who was smaller than he was." The prosecutor made the same argument with respect to Officer Garcia Ceja, a male officer: "I would argue that [Midell] picks—he picks on Officer Garcia Ceja because he is smaller." Further, these comments are supported by the evidence presented at trial. (*People v. Lawley* (2002) 27 Cal.4th 102, 156 [no misconduct where "prosecutor's argument constituted fair comment on the evidence, following evidentiary rulings we have upheld"].) Trujillo testified that she was five feet four inches tall and weighed 130 pounds and that Midell followed the commands of her male colleague Silva but ignored her directions to "cuff up." While Garcia Ceja did not testify about his height or weight, the jurors were able to observe his physical appearance on the stand. Additionally, Officer Ballard, who was working with Garcia Ceja when Midell punched Garcia Ceja, testified that Ballard was six feet four inches tall and weighed approximately 240 pounds, so Garcia Ceja was "smaller" than Ballard in comparison. In this context, the prosecutor's argument constituted fair comment on the evidence and was not misconduct. (*People v. Peterson* (2020) 10 Cal.5th 409, 465–466 ["it is not misconduct for the prosecutor to argue in closing that there was no evidence supporting a particular proposition after the trial court has properly excluded evidence that defense had sought to introduce on that point"].)

## V. Cumulative Effect

Last, Midell asserts that even if the aforementioned asserted errors were insufficient to demonstrate prejudice standing alone, when considered together this cumulative error requires reversal. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) As

discussed, the putative RJA violations are procedurally barred, and there was no error or demonstration of prejudice regarding the trial court's evidentiary rulings or the prosecution's closing argument; thus, there is nothing to cumulate. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1094 ["we have found no error to cumulate"]; see also *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 128 [no cumulative error despite "two claims of error . . . that, if not forfeited by lack of contemporaneous objection, would have had merit"]; *People v. Linton* (2013) 56 Cal.4th 1146, 1197 [no cumulative error where defendant's claims "were waived, forfeited, invited or . . . meritless"].) We therefore reject Midell's cumulative error claim and turn to his additional claims of error at sentencing.

## VI. Sentencing Challenges

Midell raises two additional challenges to his sentences on the attempted murder and torture convictions: he argues first, the trial court should have stayed one of the terms pursuant to section 654, and second, the court erred in imposing consecutive sentences. Reviewing the first claim for substantial evidence and the second for abuse of discretion, we identify no error. (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Giminez* (1975) 14 Cal.3d 68, 72.)

### A. Section 654

Midell argues the court erred in declining to stay the attempted murder or torture sentence under section 654 because the "torture and attempted murder offenses were an indivisible course of conduct."

Section 654 prohibits punishment of an "act or omission . . . under more than one provision" of law and applies where two or more crimes arise from "a single, indivisible course of conduct." (§ 654, subd. (a); *People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1112, citing *People v. Latimer* (1993) 5 Cal.4th

27

1203, 1208.) Whether a course of conduct is indivisible "depends on the intent and objective of the actor." (*DeVaughn*, at p. 1112.) "If all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one." (*Ibid.*) But, if the defendant "entertained multiple criminal objectives, which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were part of an otherwise indivisible course of conduct." (*Ibid.*)

Substantial evidence supports the court's determination that Midell formed "a separate intent and objective in torturing the victim . . . that went above and beyond the other crimes" for which Midell was convicted. Within "a second or two" of breaking through the office door at Hotel V, Midell charged Gupta and stabbed him in the neck with a boxcutter, targeting his carotid artery and demonstrating an intent to inflict a fatal injury. However, as the prosecution argued in their sentencing memorandum, when the boxcutter blade failed, Midell's intent shifted from killing to inflicting pain. Over the next 15 minutes, Midell inflicted a horrifying string of nonlethal injuries that included stabbing with a plastic pen, headbutting "about 40 to 50 times," and "chew[ing] on" Gupta's wrists, hands, and shoulder "trying to rip the flesh out." Even after the arrival of police, which meant killing was no longer a realistic possibility, Midell still refused to release Gupta and continued to bite him as officers repeatedly tased and struck Midell with a police baton until he was knocked unconscious. As such, substantial evidence supports the imposition of sentences on both the attempted murder and torture convictions.

## B. Consecutive Sentences

The court imposed consecutive terms on the attempted murder and torture convictions because it found "the crimes involved separate acts of violence or threats of violence." Midell argues error "for the reasons stated" in his argument regarding section 654, thus, we also refer to our stated reasons in concluding the court did not err.

A trial court has discretion to impose concurrent or consecutive sentences when a defendant is convicted of multiple crimes with indeterminate sentences. (§ 669, subd. (a); *People v. Leon* (2016) 243 Cal.App.4th 1003, 1025.) In exercising this discretion, courts consider the factors in California Rules of Court, rule 4.425(a), including as relevant here, whether the "crimes involved separate acts of violence or threats of violence." (*People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262.)

As discussed, substantial evidence supports the court's conclusion that stabbing Gupta in the neck with a boxcutter was an act of violence separate and independent from the conduct constituting torture, i.e., the headbutting and biting. While Midell attempts to collapse both acts into a single criminal objective of exacting revenge, we cannot say the trial court acted arbitrarily or capriciously in concluding otherwise. (*People v. Calderon* (1993) 20 Cal.App.4th 82, 87 ["when violent crimes against the same victim on one occasion have separate motives, . . . consecutive sentencing is proper"].)

## DISPOSITION

The judgment is affirmed.

_____
DESAUTELS, J.

We concur:


_____
RICHMAN, ACTING P. J.


_____
MILLER, J.


*People v. Midell* (A168758)

30

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judge: | Hon. Lisa Novak |
| Attorney for Defendant and Appellant: | Kelly C. Martin, under appointment by the Court of Appeal |
| Attorneys for Amicus Curiae on behalf of Defendant and Appellant: | Office of the State Public Defender<br>Galit Lipa<br>State Public Defender<br><br>Lisa M. Romo<br>Senior Deputy State Public Defender |
| Attorneys for Plaintiff and Respondent: | Rob Bonta<br>Attorney General of California<br><br>Lance E. Winters<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Donna M. Provenzano and<br>Amit Kurlekar<br>Deputy Attorneys General |